ESTATE OF JAY R. MONROE, DECEASED, E. F. BRITTEN, JR., AND W. G.
ZAENGLEIN, EXECUTORS, PETITIONERS, ET AL.[1] *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket Nos. 98216, 100249, 100952, 100953, 100960, 100961, 100962,
100963, 101429.

Promulgated December 18, 1941.

*Edwin Bruce Hallett, Esq.,* and *Kenneth Carroad, Esq.,* for the
petitioners.

*Arthur W. Carnduff, Esq.,* for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: Charles Pinnell; Estate of George Garrabrant, by Margaret C. Garrabrant, Executrix, and Margaret C. Garrabrant, Individually; J. Charles O'Brien; Charles Day Moulton; Louis McCloud and Minnie F. McCloud; Harry H. Thomas and Bessie J. Thomas, his wife; James C. Elms and Estate of Grace W. Elms, by James C. Elms, Alfred H. Corwin and Earl S. Johnson, Executors; Estate of John G. Zeller, Deceased, John E. Zeller and Savings Investment and Trust Company, Executors; and Estate of Abilene P. Zeller, his wife, Deceased, John E. Zeller and Savings Investment & Trust Company, Executors.

1064

### OPINION.

Van Fossan: In their tax returns each of the petitioners claimed a deduction as a bad debt of the difference between the amount paid in cash for debenture bonds of the Elbamon Co. in 1931 and the amount received in 1935 in final distribution of its assets in complete liquidation.

As fully appears above, the Savings Co. was in financial difficulty because of the shrinkage in value of its assets. In order to eliminate from the Savings Co.'s holdings certain stocks in eleven leading New York City banks, which it was compelled by the New Jersey bank examiners to sell or to carry at a greatly reduced valuation, the petitioners and ten other directors of the Savings Co. organized the Elbamon Co. The nineteen stockholders paid in cash $6,400 for their stock and also bought for cash at par debenture bonds of Elbamon totaling $633,600. Elbamon then borrowed $100,000 from the Savings Co. and, with the proceeds of the loan and the cash paid for its stock and bonds, bought the bank stocks for $737,626.96, the original cost price. Such stock had a market value of $172,489.60 at the time.

During 1932 and 1933 Elbamon sold the bank stock for $207,152.33 and reinvested the proceeds in industrial, public utility, and railroad securities. During its existence Elbamon concluded 127 transactions in securities.

In November 1932 H. E. Willer was made president of the Savings Co. He insisted that Elbamon, which had been construed to be an affiliate of the Savings Co., cease functioning and be dissolved. After much objection from the stockholders they acceded to his demands and Elbamon was dissolved in February 1935. Its assets were dis-

tributed in July 1935, each stockholder-bondholder receiving 7.42+ percent of his investment as his final liquidating distribution.

Respondent originally disallowed the deductions for failure of taxpayers to submit substantiating evidence. On brief he maintains that they are not allowable either as bad debts or losses and, in the alternative, argues that, if allowable as losses, the deductions are limited by sections 23 (j) and 117 of the Revenue Act of 1934.

Petitioners, on brief, rely chiefly on the case of *Robert Gaylord, Inc.*, 41 B. T. A. 1119. The reliance which petitioners place on the *Gaylord* case is obviously misplaced. The deduction in that case was allowed as an ordinary and necessary business expense of a corporation on facts differing greatly from those here present. Here the taxpayers are individuals and on the record it could not be held by any stretch of reason that the purchase of the bonds was an ordinary and necessary expense of their several trades or businesses.

The purchase of debenture bonds is usually motivated by investment considerations. It contemplates normally a situation in which there is a purchase at market price with reasonable expectation of profit either from interest or appreciation in value. The mere statement of the facts in the present cases suggests an abnormal situation. Nineteen persons paid $6,400 for Elbamon's stock. These stockholders paid $633,600 for Elbamon income bonds when that company had no assets. The bonds were not secured by a mortgage or otherwise. Elbamon borrowed $100,000 from the Savings Co. and pledged all of its assets (including the bank stock to be acquired). At this point Elbamon had $740,000 in cash. Elbamon then paid $737,626.96 for the bank stocks, admittedly worth but $172,489.60. Thereafter, assuming as we must the priority of the rights of the Savings Co. as the pledgee of the assets over the rights of the bondholders, the debenture bonds had but $74,862.64 worth of assets behind them. The value of the debenture bonds, *qua* bonds, at the time of the purchase, could not have been in excess of the value of its assets thus marshalled. This wide disparity between price and value suggests that the excess of the purchase price was not paid for an investment. The only reasonable inference is that the excess of price was paid for some other purpose. See *Majestic Securities Corporation* v. *Commissioner*, 120 Fed. (2d) 12, in which it was observed:

\* \* \* It is clear from the stipulated facts that at the time the securities were acquired from the bank their market value was much less than their original cost and that the assets of the bank were depreciated proportionately. When the relation of petitioner's stockholders to the bank and their resulting interest in the bank's financial condition are considered in connection with this fact it is a reasonable inference that the payment of the excess over market value was for the purpose of improving the condition of the bank. If this be true the excess was paid "for a purpose other than the acquisition of the securities", and such excess did not represent a part of the cost.

The reasoning of this case is pertinent here. The "other purpose" in the instant cases was to provide Elbamon with funds so that it in turn might relieve the Savings Co. of its investment in the stocks of several New York banks, the write-down or disposition of which stocks had been ordered by the bank examiner. Thus, looked at as an investment in Elbamon, the excess can not be said to be part of the cost of the debentures. It was a contribution or gift, with no reasonable expectation of recovery. If the corporate entity of Elbamon be overlooked, the excess might be said to be a contribution to the Savings Co., which company is still in existence. In neither view can petitioners find comfort. Thus it is that the excess expenditure can form no part of a bad debt deduction.

The question remains whether the bondholders are entitled to deductions in an aggregate amount measured by the difference between a cost equal to the net amount of Elbamon's assets ($74,862.64) at the time of purchase and the amount received in liquidation ($47,499.38).

It would seem that such a deduction should be allowed. The corollary of the holding in *Majestic Securities Corporation, supra*, is that to the extent that the payment was not a gift or contribution, i. e., in so far as it represented a payment for the bonds themselves and not for some other purpose, it was a true cost of the bonds. This cost we find to be $74,862.64, the amount available to the bondholders if liquidation had taken place in 1931.

A further question arises however: Are petitioners limited by the provisions of section 117 respecting capital gains and losses? The answer to this question depends on whether petitioners come within the scope of section 117 (f).[2] We have found as a fact that the bonds were, in the language of the statute, issued "in registered form." We also hold that there was a "retirement" of the bonds within the meaning of that term in the cited section. See *McClain* v. *Commissioner*, 311 U. S. 527, where the Court observed, "it is plain that Congress intended by the new subsection (f) to take out of the bad debt provisions certain transactions and to place them in the category of capital gains and losses." This holding requires the application of the provisions of section 117 to the deductions here involved. To the limited extent above indicated the deductions are allowed.

*Decisions will be entered under Rule 50.*

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

    \*        \*        \*        \*        \*        \*

(f) RETIREMENT OF BONDS, ETC.—For the purposes of this title, amounts received by the holder upon the retirement of bonds, debentures, notes, or certificates or other evidences of indebtedness issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form, shall be considered as amounts received in exchange therefor.